1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

BRANDON ARMITAGE,                          )    Civil No. 09cv463-L (POR)
                                           )
10                          Petitioner,    )
                                           )
11  v.                                     )    **REPORT AND RECOMMENDATION**
                                           )    **THAT PETITION FOR WRIT OF**
12  KENNETH CLARK,                         )    **HABEAS CORPUS BE GRANTED IN**
                                           )    **PART AND DENIED IN PART**
13                          Respondent.    )
                                           )
14  _____

15
16                              **I.      INTRODUCTION**

17
        On March 6, 2009, petitioner, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas
18
Corpus ("petition") pursuant to 28 U.S.C. §2254.  Petitioner claims that unclear responses by the Court to
19
juror questions during deliberations allowed the jury to convict him under an improper theory of burglary.
20
Petitioner also claims the California Court of Appeals failed to address this claim on direct appeal,
21
notwithstanding petitioner's inclusion of this claim in both his opening and reply briefs.
22
        The Honorable M. James Lorenz dismissed the petition without prejudice on March 18, 2009
23
because petitioner failed to pay the filing fee.  Petitioner subsequently paid the filing fee on April 2, 2009
24
and the case was reopened on April 10, 2009.  Respondent filed an answer on July 22, 2009 and petitioner
25
filed a traverse on September 3, 2009.
26

27
                              **II.      FACTUAL BACKGROUND**
28

09cv463

1

2           The instant petition is governed by the Antiterrorism and Effective Death Penalty

3 Act of 1996 ("AEDPA"). 28 U.S.C. §2254. Under §2254(e)(1), state court findings

4 of fact are presumed to be correct unless rebutted by clear and convincing evidence. The

5 following factual background is taken from the unpublished opinion of the California Court

6 of Appeals, Fourth Appellate District. (Log. 9.)

7             In July 2002, Gregory Smith, Gary Thomas and Armitage's father Lionel leased a house

8 in Clairemont and agreed there would be no drugs, alcohol, or weapons in the house. All three had had substance abuse problems in the past and were committed to living a clean and sober life.

9             In August or September, Armitage[1] moved into the house and brought some appliances and furniture with him. In December, Armitage was asked to move out because it was

10 discovered he was bringing alcohol into the house.

11             On the evening of January 5, 2003, Thomas heard a loud noise that sounded like a gunshot. Thomas opened the front door of the house and saw Armitage with a couple of friends. Thomas asked Armitage if he had heard anything. Armitage replied, "No. It's okay." Thomas

12 let Armitage into the house because he assumed Lionel was there; shortly thereafter, Thomas left.

13             Meanwhile, Smith encountered Armitage and one of his friends in the hallway and asked

14 what was "going on." Armitage placed his hand on the butt of a semiautomatic pistol that was in his belt and told Smith he needed to "lock it up in his room." As Smith walked to his room, he

15 heard a gunshot from behind him. Later, a bullet was found in a kitchen cabinet, and the front door frame had a bullet hole. The next day Smith and Thomas put a lock on the gate to the backyard because they were concerned that Armitage was armed on January 5.[2]

16             On the evening of January 7, as he was taking out the trash, Smith saw Armitage sitting

17 in a car. Later, Thomas told Smith that someone was trying to break into his room, which was a screened-in patio. Police responded to Smith's 911 telephone call, but could not find any

18 intruders. After the police left, Smith saw Armitage, who was carrying a large bottle of beer, walking up the driveway and toward the gate that led to the backyard. Smith saw a gun in

19 Armitage's waistband. Smith telephoned 911 again, and police responded to the house a second time. Officer Anthony Conrad went to the door of Lionel's room, announced himself as being

20 with the City of San Diego Police Department and demanded entry. A man inside the room, later identified as Armitage, said, "No." Conrad threatened to force the door open and Armitage replied, "Go ahead. I'm not coming out." Conrad heard a sound like a handgun being loaded.

21             Conrad cleared the house, set up a perimeter and called a SWAT team. A five-hour standoff ensued as Armitage refused to come out of the room. SWAT Officer Michael Alberts

22 observed Armitage crawling on the floor of the house at various times during the standoff. Eventually, the police convinced Armitage to come out of the house and surrender. During a

23 search of the house, police found a .45-caliber handgun, rounds of ammunition and a loaded magazine.

24             On September 12, Armitage appeared in court for pretrial motions, and the proceedings were recessed until the following Monday. Over the weekend, Armitage posted bail. On

25 Monday, September 15, Armitage failed to appear in court for trial. A bench warrant was issued.

26             On September 16, about 6:00 a.m., David Tuites opened the automatic garage door of his

---

27 [1] At trial, it was stipulated that Armitage had been previously convicted of a felony.

[2] In connection with the January 5 incident, Armitage was charged with one count of being a felon in possession of a gun (§

28 12021, subd. (a)(1) and one count of discharging a firearm in a grossly negligent manner (§ 246.3). The jury was unable to reach a verdict on these counts, and the court later dismissed the counts.

house in Tierrasanta to retrieve his newspaper. Shortly thereafter, his wife went into the garage and saw Armitage sitting in her car; Armitage was moving his hands near the dashboard. When Mrs. Tuites asked Armitage what he was doing, he replied, "Excuse me?" Mrs. Tuites ran inside to tell her husband, who then telephoned 911.

Officers asked Armitage, who was still sitting in the driver's seat of the car, to show his hands. In response, Armitage "flipped off" the officers and said "F*** off" or "F*** you" before putting his hands back underneath the steering wheel.

Officers used a bean bag to shoot out the front passenger window and then shot pepper pellets into the car. The pellets release pepper dust, which hampers breathing. The pellets were hitting Armitage on his upper arm, and he put his hand up to deflect the pellets. Armitage appeared highly agitated; he began sweating profusely and was yelling and growling. Nonetheless, Armitage continued to use his left hand to work on the steering column of the car.

The officers released a police dog into the car. Even though the dog bit Armitage, he would not come out of the car. Finally, three officers pulled Armitage out of the car. It had taken 20 minutes to remove him from the car. A coffee can of tools that had been on a garage shelf was in the car. A good deal of wiring had been pulled out from the front dashboard as well as the car stereo, which was destroyed.

Testifying in his defense, Armitage said he had his father's permission to be at the Clairemont house on January 5 and 7, 2003. Armitage admitted that on January 7 he climbed over the locked gate and ripped a hole in the patio screen door to gain entry to the house because no one had answered when he knocked on the front door. Armitage went into his father's room and shut the door. Armitage denied having a gun and entering the house to commit a felony.

Armitage testified that when the police initially knocked on the door to his father's room, he believed it was Smith or Thomas pretending to be the police. Once he realized the police were seeking entry, he did not come out because he did not want to go to jail.

As to the incident in the Tuiteses' garage, Armitage said he was "tripping" or hallucinating while under the influence of methamphetamine. He did not plan to steal the Tuiteses' car or commit a felony when he entered the garage. Rather he was looking for a note with directions. Armitage testified, "It made sense at the time," and he did not believe he was doing anything wrong. When the police arrived, Armitage did not get out of the car because he knew they would take him to jail. Armitage felt no pain when the dog bit him, and the pepper pellets did not hurt. He kept his left hand out of view to bluff the officers into thinking he had a weapon.


### III.    PROCEDURAL BACKGROUND


On November 19, 2003, a jury convicted petitioner of five counts, 1) burglary of an inhabited dwelling on January 7, 2003; 2) possession of a firearm by a felon on January 7, 2003; 3) possession of ammunition by a person prohibited from possessing a firearm on January 7, 2003; 4) burglary of an inhabited dwelling house on September 16, 2003; 5) failure to appear by a person released from custody on bail. (Log. 3 at 2. ) The jury was unable to reach a verdict on two counts, possession of a firearm by a felon on January 5, 2003 and discharge of a firearm in a grossly negligent manner. Id.

09cv463

1    Petitioner filed an appeal with the California Court of Appeal, Fourth Appellate District on June

2    24, 2004 containing four claims: 1) There is insufficient evidence to support the January 2003 burglary

3    and the September 2003 burglary was prosecuted on an improper theory; 2) There is insufficient

4    evidence to support the January burglary where appellant's father, one of the residents of the residence,

5    gave appellant the absolute right to enter; 3) The trial court failed to instruct on an element of the

6    charged January burglary and a defense theory of the case; 4) The trial court erred in refusing to instruct

7    on trespass where it was a lesser included offense based on the accusatory pleadings. (Log. 3.)

8    The California Court of Appeals issued an unpublished opinion on May 31, 2005.  In its opinion,

9    the California Court of Appeals reversed the January burglary conviction, under the following rationale:

10        [The]prosecution's theory of this burglary case was that Armitage entered the
           building with the specific intent to commit the crime of possession of a firearm by a
11         felon.[1]  However, it was undisputed that Armitage was armed before he entered the
           residence, as noted by the prosecutor in his closing argument.  Thus, Armitage, a
12         convicted felon, committed the crime of possession of a firearm by a felon before
           entering the residence.  Log. 9 at 7.

13
      Because Armitage's "entry into the residence did not facilitate the commission of the felony,"
14
     the California Court of Appeals found there was insufficient evidence of an element of the crime of
15
     burglary and reversed his conviction.
16

17    However, the California Court of Appeals affirmed petitioner's conviction for the September

18   burglary.  Regarding that offense, the California Court of Appeals stated, "substantial evidence

19   supported the conviction of this burglary count on the basis he entered the garage with the specific intent

20   to steal the car stereo" and "[w]e disagree with Armitage's argument that the court implicitly told the

21   jury it could convict him of burglary on any theory other than theft being the target or underlying

22   offense."  (Log. 9 at 10-11.)

23    Following the California Court of Appeals decision, petitioner filed a petition for rehearing.  The

24   Court of Appeals denied petitioner's request on June 10, 2005.  (Log 11.)

25    Petitioner subsequently filed a petition for review of his September 2003 conviction

26   to the California Supreme Court.  The questions presented were:

27

28   _____
      [1] The jury was instructed on this count pursuant to CALJIC No. 14.50, with possession of a firearm by a felon being the
      crime identified as the one Armitage intended to commit when he entered the building.

4

09cv463

1      1.      Was appellant denied his federal and state constitutional rights to due process and a fair trial where the jury was permitted to convict him on either of two theories for burglary and the appellate court correctly resolved that one of those theories did not meet the requisites of the burglary statute?

2.      Was appellant denied his federal constitutional right to due process by the denial of his state right to appeal where the appellate court failed to address a federal and state constitutional claim on appeal?

The California Supreme Court denied petitioner's request for review without opinion or comment on August 31, 2005.[2]

## IV.   DISCUSSION

Under 28 U.S.C. §2254, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §2254(a).  A habeas petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(d).

In the instant petition, petitioner asserts the same two claims that he brought before the California Supreme Court: 1) "The jury was permitted to premise the September 2003 burglary on an improper theory and thereby denied petitioner his constitutional right to due process"; and 2) "Petitioner was denied his federal constitutional right to due process by the denial of his state right to appeal where the appellate court failed to address a federal and state constitutional claim on appeal."  (Doc. 1 at 6-7.)

The Court will first address petitioner's argument that the California Court of Appeals failed to address his claim that the jury was permitted to premise its verdict for the September burglary under an improper theory of law.

---

[2]Due to the California Court of Appeals reversal of petitioner's January 2003 burglary conviction, petitioner's case was remanded back to the trial court for resentencing.  Petitioner's resentencing, and subsequent appeals on that issue, concluded on August 12, 2008.  Accordingly, Respondent concedes that the instant petition, filed on March 6, 2009, is timely under AEDPA.  (Doc. 9 at 5.)

09cv463

1

2 **A.     Failure to Address Constitutional Claim on Appeal**

3          Petitioner claims that instead of addressing his claim that the jury was permitted to convict him

4 under an improper theory, the California Court of Appeals construed his claim as stating there was

5 insufficient evidence to support his conviction.

6          In his opening brief to the California Courts of Appeal, petitioner characterized his argument as

7 follows: "There is insufficient evidence to support the January 2003 burglary and the September 2003

8 burglary was prosecuted on an improper theory." (Log 3 at 15.)  For the September 2003 burglary

9 petitioner contended the trial court gave the jury conflicting instructions which said that entering with

10 the intent to commit *any* felony satisfied the requirements for burglary in both the January and

11 September instances.  However, for the September 2003 burglary only the Court instructed the jury that

12 it had to find petitioner had the specific intent to steal and take and carry away someone else's property,

13 and intend to deprive the owner permanently of that property.  Id. at 22.  Petitioner then states that when

14 the jurors asked if possession of methamphetamine could provide the requisite felony for burglary, "the

15 Court did not tell them it could not."  Id. at 22-23.   Petitioner further states "[t]here is no basis in the

16 record to find that the verdict on the September burglary was actually based on a valid ground, i.e., entry

17 with the intent to commit theft" and "the court provided evasive answers that did not explicitly foreclose

18 the use of the possession offense as the requisite felony for the September burglary." Id. at 23.

19 Petitioner concludes by stating "it is inconceivable that their verdict was premised on anything but the

20 improper theory" and "[w]here, as here, the inadequacy of proof is legal not merely factual, that is when

21 the facts do not state a crime under the applicable statute, reversal is required."  Id. at 24.

22          In its response, respondent stated "[t]here was substantial evidence to support that appellant

23 intended to steal the car stereo out of the Tuites' car when he entered their garage" and recited the test

24 for reviewing a claim of insufficiency of the evidence.  (Log. 5 at 18.)  In another section of its brief,

25 respondent claims "the jury was properly instructed on burglary" and "[t]here was no evidence the jury

26 premised their guilty verdict on the felony of possession of methamphetamine."  Id. at 22.  Respondent

27 begins his conclusion of that section stating "where there is sufficient evidence to support one of the

28 factual theories of guilt asserted by the prosecution, appellate courts will presume the jury adopted that

09cv463

1    theory and affirm the judgment." Id at 25.  Respondent concluded by stating because "the jury could

2    have reasonably found [petitioner's] admission that he possessed methamphetamine to be incredible"

3    and "there was substantial evidence [he] committed the burglary with the underlying felony being his

4    intent the steal the car stereo . . . [The] Court should presume the jury adopted that theory supported by

5    the evidence and affirm the judgment."  Id. at 26.

6          In his reply brief, petitioner again frames the issue with respect to the September burglary as

7    although petitioner does not "know explicitly what theory the jury relied upon . . .the jury was permitted

8    [if not encouraged] to premise the September 2003 burglary on an improper theory," that is an

9    alternative theory to an entry to theft.   (Log. 6 at 4-5.)

10          In its decision, the California Court of Appeals titled the heading dealing with the September

11   2003 burglary as "Burglary Count Involving Tuiteses' Garage Premised on Valid Theory."  (Log. 9 at

12   10.)  The first subheading under this section reads "Substantial Evidence Supports Conviction on Valid

13   Ground."  Id. at 11.  The Court then states that the "prosecution's theory for the September 2003

14   burglary was that Armitage entered the Tuiteses' garage with the intent to steal their car or the car

15   stereo" and that "[i]n reviewing the sufficiency of the evidence . . ., the question we ask is whether, after

16   viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

17   found the essential elements of the crime beyond a reasonable doubt." Id. (internal citations omitted).

18   Ultimately the court states, "[i]t does not matter if the evidence is capable of being interpreted in two

19   different ways;  as long as the verdict is supported by substantial evidence, we cannot substitute a

20   different determination for that of the fact finder." Id. at 10.

21          Although the California Court of Appeals began its review of petitioner's claim with a

22   discussion on insufficiency of the evidence, the Court does address petitioner's contention that the trial

23   court "essentially [gave] its imprimatur to convict[] him on the erroneous theory that he entered the

24   garage with the specific intent to commit the crime of being under the influence of methamphetamine."

25   Id.  Ultimately, the Court concluded that petitioner's "suggestion that the jury convicted him of

26   burglary on the basis that he had the specific intent to be under the influence of methamphetamine is

27   unsupported."  Id. at 12.

28          After the Court issued its opinion, petitioner requested a rehearing to address the argument that

7

09cv463

the jury was permitted to premise the September 2003 burglary on an improper theory.  ( See Log. 10.)
Petitioner states explicitly " [t]he argument is not that there was insufficient evidence to support the
September 2003 burglary."  Rather, "[t]he argument is that when the jury is permitted, as it was here, to
elect between two theories, that is competing definitions for burglary, one of which is a correct
statement of law and one of which is an incorrect statement of the law and it cannot be determined upon
which theory all of the jurors premise their verdict, then the conviction cannot stand." (Id. at 2. )
Petitioner claims the insufficiency of the evidence argument was a "strawman" theory argued by
respondent.

It is true that the California Court of Appeals focused primarily on whether there was sufficient
evidence to support the September 2003 burglary conviction rather than whether the jury was allowed to
convict petitioner under an improper theory.  However, that Court did ultimately address the argument
and found "[t]here was nothing erroneous about the instruction for this burglary count or the court's
responses to the jury's questions."  (Log. 9 at 11.)  The Court also stated: "We disagree with Armitage's
argument that the court implicitly told the jury it could convict him of burglary on any theory other than
theft being the target or underlying offense."  Id.

Based on this Court's finding that the California Courts of Appeal addressed petitioner's claim
that the jury was permitted to convict him under an improper theory, this Court recommends that
petitioner's second claim for relief be DENIED.

**B.     September 2003 Burglary Conviction**

**1.  Clearly Established Law**

The next claim avers the jury was permitted to premise the September 2003 burglary on an
improper theory and thereby denied petitioner his constitutional right to due process.   As mentioned in
section A, supra, the California Court of Appeals addressed this claim in its opinion.  Thus, as a
threshold matter, this Court must determine the clearly established law at the time the California Court

8

1    of Appeals rendered its decision that should have been applied to petitioner's claim.   See 28 U.S.C.

2    §2254(d)(1).

3         The thrust of petitioner's claim is that the jury was confused about a specific jury instruction.

4    Petitioner contends the trial court's responses to the jury's questions about that instruction did not

5    eliminate the confusion and the jury was thereby allowed to convict him under an improper theory in

6    violation of the Due Process Clause.

7         Under these circumstances the Supreme Court has held the proper inquiry is "whether there is a

8    reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the

9    consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 381 (1990).

10   That standard does not require the defendant to demonstrate "the jury was more likely than not to have

11   been impermissibly inhibited by the instruction."  Id.

12         When conducting this analysis, the reviewing court  "'may not [view the challenged instruction]

13   in artificial isolation,' but must [consider it] in the context of the instructions as a whole and the trial

14   record." Estelle v. Mcguire, 502 U.S. 62, 72 (1991)(citing Cupp v. Naughten, 414 U.S. 141, 147 (1973).

15

16         In claims alleging due process violations in the context of erroneous jury instructions, the

17   Supreme Court has admonished that it defines "the category of infractions that violate 'fundamental

18   fairness' very narrowly." Id. (citing Dowling v. United States, 493 U.S. 342, 352(1990)).   However,

19   among those narrow categories of infractions are instructions that permit the jury to convict a defendant

20   without finding each element of the relevant statute.  Osborne v. Ohio, 495 U.S. 103, 123 (1990).  See

21   also In re Winship, 397 U.S. 358, 364 (1970) ("the due process clause protects the accused against

22   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime

23   with which he is charged.")

24         In this case, the question is whether there is a reasonable likelihood that the jury applied the

25   challenged instruction in a way that prevented it from finding that petitioner's conduct satisfied each

26   element of the California  burglary statute before it rendered a guilty verdict.

27

28

09cv463

Viewing the jury instructions and responses as a whole, this Court finds the decision reached by the California Court of Appeals that there was "nothing erroneous" about the trial court's instructions or responses to the jury's questions an objectively unreasonable application of Supreme Court law.

### 2.      Jury Instructions and Deliberation

The jury ultimately found petitioner guilty of two burglary offenses, one committed in January 2003 and the other in September 2003.

Regarding the January burglary, the court instructed the jury:

> The defendant is accused in Count One[3] of having committed the crime of burglary, violation of section 459 of the Penal Code. Every person who enters any building with the specific intent to commit a felony, in this case the crime of possession of a firearm by a felon, is guilty of the crime of burglary, which is a violation of 459 of the Penal Code. So burglary is a specific-intent crime. If you enter with the intent to commit a felony, then you're guilty of burglary whether or not you actually commit a felony.
> If you enter with the intent to rape, if that was your intent when you entered, it doesn't make any difference if you raped anyone or not. If you enter with the intent to commit a felony, that's the definition of burglary.
> And I'll get to the next one; this is the one we're talking about in Count 1, which is entering a building with the intent to be in possession of a firearm by a felon.
> One deals with theft, that you entered a building with the intent, specific intent to commit a theft. There is [sic] two definitions of burglary. I'm going to read you the first one, okay, which I've already started.
> It does not matter whether the intent with which the entry was made was thereafter carried out. In order to prove this crime as to Count 1, each of the following elements must be proved: One, that a person entered a building; and two, that at the time of the entry into that building that person had the specific intent to commit the crime of possession of a firearm by a felon.
> In either case, Count 6 or Count 1, if you should find that the defendant is guilty of burglary because he entered with that specific intent to commit a felony or commit a theft, you then must determine the degree and state that degree in your verdict forms, which will be provided. (Log. 2 at 300-301.)[4]

The Court subsequently instructed the jury on the September burglary:

---

[3] Count 1 refers to the January 7, 2003 burglary and Count 6 refers to the September 16, 2003 burglary

[4] The written instruction that the jury had during deliberation differed slightly: It stated:

Defendant is accused in Count One of having committed the crime of burglary, a violation of section 459 of the Penal Code.

Every person who enters any building with the specific intent to commit the crime of Possession of a Firearm By A Felon, a felony, is guilty of the crime of burglary in violation of Penal Code section 459.

It does not matter whether the intent with which the entry was made was thereafter carried out.

In order to prove this crime, each of the following elements must be proved:

1.      A person entered a building; and
2.      At the time of the entry, that person had the specific intent to commit the crime of Possession of a Firearm By A Felon.   (Log. 1 at 87.)

09cv463

1        Now, the defendant is accused in Count 6 of having committed the crime of burglary.
That was the alleged September incident.  Every person who enters any building with a specific

2  intent to steal, to take and carry away the personal property of another of any value, and with a
further specific intent to deprive that owner permanently of that property, or with a specific

3  intent to commit any felony, as you know, is guilty of the crime of burglary, which is a violation
of Penal Code section 459.

4        It does not matter whether the intent with which the entry was made was thereafter
carried out.

5        In order to prove this crime, each of these following elements must be proved: Simply
that a person entered a building, that's first; and, second, at the time of the entry, that person had

6  the specific intent to steal and take and carry away someone else's property, and intended to
deprive the owner permanently of that property.

7  (Log. 2 at 306.)[5]

8

9       The jury began deliberations at 10:08 a.m.  At 2:08 p.m., the jury submitted a question to the

10  Court.  (Log. 1 at 353.)  The question asked:

11        In count 6 in the crime of burglary.  Does the specific intent to commit a felony have to
be a specific intent to commit a theft, or could it be a specific intent to commit any other felony.

12  (For example possession of illegal substance, (meth.) [?] (Log.9 at 10.)

13       The Court conferred with counsel then provided the jury with the following written response

14  [Log. 1 at 353.]:

15        The theory advanced by the District Attorney is that the Defendant entered an inhabited
dwelling house with the specific intent to steal, not to commit another crime.  (Log. 9 at 10.)

16       The Court then recessed at 2:10 p.m.  (Log 1 at 353.)

17       At 2:45 p.m., the jury submitted a second question to the Court [Id.]:

18        Are we limited to considering only the theory advanced by the District Attorney, or does
the law allow us to take into consideration evidence given by the defendant['s own testimony.

19        We are specifically confused by [page] 47 of the jury instructions.  Paragraph 2- line 5
seems inconsistent with the 4th paragraph. (Log. 9 at 10-11.)

20

21       Both the California Court of Appeals and petitioner indicate the following paragraph is the one

22  referred to by the jury.  (Log 3 at 19); (Log 9 at 11.)

23        Every person who enters any building with a specific intent to steal, to take and carry

---

[5]The written jury instruction for Count 6 read as follows:

24      Defendant is accused in Count Six of having committed the crime of burglary, a violation of section 459 of the Penal
Code.] (sic)

25      Every person who enters any building with the specific intent to steal, take and carry away the personal property of

26  another of any value and with the further specific intent to deprive the owner permanently of that property or with the specific
intent to commit any felony, is guilty of the crime of burglary in violation of Penal Code section 459.

27      It does not matter whether the intent with which the entry was made was thereafter carried out.
    In order to prove this crime, each of the following elements must be proved:

28      1.    A person entered a building; and
    2.    At the time of the entry, that person had the specific intent to steal and take away someone else's property,
      and intended to deprive the owner permanently of that property. (Log. 1 at 99.)

09cv463

away the personal property of another of any value, and with a further specific intent to deprive that owner permanently of that property, or with a specific intent to commit any felony, as you know, is guilty of the crime of burglary, which is a violation of Penal Code section 459.

The Court responded at 3:09 p.m. [Log 1 at 353]:

> The accurate definition of burglary is set forth on [page] 47 of your jury instructions.

At 3:58 p.m., the bailiff informed the Court that the jury was deadlocked on certain counts.  Id.

At 4:26 p.m. the Court resumed session and the presiding juror stated that verdicts had been reached on all but two counts (count 2 and 3). Id.

The jury found petitioner guilty of both burglary counts.  During sentencing,  defense counsel told the court that based on the jurors' questions during deliberations, the jury  used the defendant's felonious intent to possess methamphetamine to convict defendant of the  September burglary.  (Log 12 at 5.)   The prosecutor responded:

> For the record, I also spoke to the jurors, and while they did discuss the methamphetamine issue, they also assured us that they would have found, and most likely did find, depending on which juror you speak to, that he entered with the intent to commit theft on the second burglary.  Id.

3.   **Analysis**

Based on the foregoing, the California Court of Appeals found there was "nothing erroneous" about the trial court's instruction on burglary or responses to the jury's questions.  (Log 9 at 11.) Without citing any legal authority, the California Court of Appeals reasoned:

> It is pure speculation on Armitage's part to suggest the jury relied on possession of methamphetamine as the target offense for this burglary count.  The jury notes merely indicate that at two different points of time, at least one juror was unclear as to the target offense. Beyond this, Armitage's suggestion that the jury convicted him of burglary on the basis that he had the specific intent to be under the influence of methamphetamine is unsupported.  Further, we note that with respect to the other burglary count, the jury was instructed on the offense of possession of a gun by a felon . . . but the court did not instruct the jury on the crime of possession of methamphetamine in connection with this burglary count.  We are unpersuaded by [petitioner's] attempts to bootstrap his valid argument that the first burglary count was based upon an improper theory onto the second burglary count.  Id. at 11-12.

09cv463

1    When analyzing the likelihood that the jury misunderstood, and thus misapplied, a particular

2    instruction, the Court must look at the jury instructions as a whole.  Estelle v. Mcguire, 502 U.S. 62, 72

3    (1991)(citing Cupp v. Naughten, 414 U.S. 141, 147 (1973).

4    In the Court's instruction for the January burglary, the Court instructed the jury that entering a

5    dwelling with the specific intent to commit *any felony* satisfied the requirements for either the January

6    or September burglary.  This Court first notes that this portion of the instruction is technically correct.

7    In the same instruction the Court also instructed the jury, erroneously, that a finding that petitioner

8    entered a dwelling with the specific intent to commit the felony of being a felon in possession of a

9    firearm satisfied the requisite elements for the January  burglary.  As a result of this erroneous

10   instruction, the jury was under the incorrect belief that a determination that the defendant possessed

11   something illegal prior to entering the dwelling could satisfy the "entry with the specific intent to

12   commit any felony"  element of burglary.

13   However, after this instruction, the Court properly instructed the jury on the September burglary.

14   The Court informed the jury that it had to find both that defendant entered an inhabited dwelling and

15   that at the time of entry defendant had *either* the specific intent " to steal, to take and carry away the

16   personal property of another of any value, and with a further specific intent to deprive that owner

17   permanently of that property" **or** the "specific intent to commit any felony."  Because the only theory

18   argued by the district attorney during trial was that defendant entered the Tuiteses' garage with the

19   specific intent to steal a car or car stereo, the Court further instructed that the jury had to find each of the

20   following elements: 1) "that a person entered a building"; 2)" at the time of the entry, that person had

21   the specific intent to steal and take and carry away someone else's property, and intended to deprive the

22   owner permanently of that property."

23   This court acknowledges that this instruction appears to clearly and accurately state the law.

24   However, although the "specific intent to commit any felony" language appeared in the instructions for

25   both the January and September burglaries, the jury only inquired about the language in regard to the

26   September burglary.   Moreover, although there were six counts for the jury to decide, and the jury

27

28

13

09cv463

ultimately deadlocked on two of those counts, the jury only posed questions about the September burglary.

The jury's first question, "In count 6 in the crime of burglary.  Does the specific intent to commit a felony have to be a specific intent to commit a theft, or could it be a specific intent to commit any other felony.  (For example possession of illegal substance, (meth.) [?]," demonstrates that at least one juror believed that petitioner's ingestion of methamphetamine before entering the Tutitses' garage was a felony.  This question also suggests the possibility that this juror (or jurors) asked the question because they were not convinced petitioner entered the garage with the intent to steal and wanted to know if petitioner's felonious ingestion of methamphetamine could satisfy the  "any felony" language of the instruction.

It is well settled that the trial court has great discretion in responding to jury questions.  See, e.g., United States v. Walker, 575 F.2d 209, 214 (9th Cir. 1978).  In this case, the trial court did not specifically inform the jury that it had to find that petitioner entered the garage with the specific intent to steal in order to convict him of the September burglary.  However, the court did tell the jury that the sole theory advanced by the district attorney was that petitioner entered the garage with the specific intent to steal.

In many cases, the trial court's answer here would likely have settled the matter.  However, in this particular case, the jury returned almost forty minutes later with a follow-up question.  Unlike the first question which was phrased in a manner that did not indicate whether in fact only one juror had confusion,  the second question was phrased in the collective:  "Are **we** limited to considering only the theory advanced by the District Attorney, or does the law allow **us** to take into consideration evidence given by the defendant['s own testimony. [¶] **We** are specifically confused by [page] 47 of the jury instructions.  Paragraph 2- line 5 seems inconsistent with the 4th paragraph." (Log. 9 at 10-11.)

At this point it is abundantly clear that one or more members of the jury were very confused about the "specific intent to commit any felony" language of the jury instruction.  It is also clear to this

1    Court that the confused juror ( s)  would not continue to ask questions on this matter if it had been able

2    to find the requisite elements of burglary under the prosecutor's theory of the case.  The trial court

3    specifically stated in its instruction for the September burglary that the jury needed to find that petitioner

4    entered with the specific intent to steal in order to render a guilty verdict.  Nonetheless, the jury inquired

5    whether inclusion of the "any felony" language allowed conviction under an alternate theory of the case.

6

7            In addition, viewing both questions together it is apparent that the "evidence given by the

8    defendant's own testimony" that the jury wanted to consider was defendant's admission that he was

9    high on methamphetamine at the time he entered the Tuitses' garage.

10           Thus, the only question remaining  is whether at this point in the deliberations, with at least one,

11   and probably more, jurors inquiring if they can use petitioner's possession/ingestion of

12   methamphetamine as the "any felony" to satisfy one of the elements of burglary, the trial court's

13   response was constitutionally sufficient.

14           The response given by the trial court stated "The accurate definition of burglary is set forth on

15   p.47 of your jury instructions."

16           Instead of eliminating the jury's confusion, the trial court merely directed the jury back to the

17   same instruction that prompted the questions in the first place.

18           Less than an hour later, the jury informed the bailiff that they were deadlocked on certain counts

19   and when the court resumed session a half hour later, the jury announced a guilty verdict for the

20   September burglary.

21           As mentioned previously, the trial court has wide discretion in responding to jury questions.

22   However "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with

23   concrete accuracy."  Bollenbach v. United States, 326 U.S. 607, 612-13 (1946).   The Ninth Circuit has

24   stated "[t]here is no one-size-fits all response to jury disorientation."  McDowell v. Calderon, 130 F.3d

25   833, 840 (9th Cir. 1997).  Yet, "[t]here is no point in reiterating language which has failed to enlighten

26   the jury."  Id. at 838 (citing People v. McDowell, 46 Cal.3d 551, 581 (1988)).  Under such

27

28

09cv463

1   circumstances, "it would be folly to presume-as we usually do- that in the end they got it right and

2   followed the law." Id. at 839.

3         This is especially true given the prosecutor's statement during sentencing that the jurors

4   discussed the methamphetamine issue but assured the prosecutor they "would have found, and most

5   likely did find, depending on which juror you speak to" that defendant entered with the intent to commit

6   theft.  The phrase "would have found" necessarily means multiple jurors **did not find** that defendant

7   entered with the intent to commit theft.

8         This Court is mindful of the Supreme Court's decision in <u>Weeks v. Angelone</u> that responding to

9   a jury's question by "directing its attention to the precise paragraph of the constitutionally adequate

10  instruction that answers its inquiry" is constitutionally sufficient.  528 U.S. 225, 234 (2000).  In <u>Weeks</u>

11  <u>v. Angelone</u>, the Court dealt with the propriety of a judge's response to a jury's question in a capital

12  case.  In that case, the jury asked:

13        If we believe that [defendant] is guilty of at least 1 of the alternatives, then is it our duty as a jury
          to <u>issue</u> the death penalty?  Or must we decide (even though he is guilty of one of the
14        alternatives) whether or not to issue the death penalty, or one of the life sentences? What is the
          Rule?  Please clarify?  Id. at 229.
15
          The judge responded by saying "See second paragraph of Instruction #2."
16
          The second paragraph of that instruction read:
17
          If you find from the evidence that the Commonwealth has proved, either of the two alternatives,
18        and as to that alternative, you are unanimous, then you may fix the punishment of the defendant
          at death, or if you believe from all the evidence that the death penalty is not justified, then you
19        shall fix the punishment of the defendant at imprisonment for life, or imprisonment for life with
          a fine not to exceed $100,000.  Id.
20

21        While the prosecutor agreed with the Judge's decision to refer the jury back to that instruction,

22  defense counsel objected and wanted the Judge to inform the jury that even if they find the alternatives

23  had been proved beyond a reasonable doubt, they could still impose a life sentence.  Id. at 230.

24        After more than two hours, the jury returned with a verdict imposing the death penalty.

25        Petitioner subsequently claimed the judge's response to the jury's question was erroneous.

26  However, the Court found that the original instruction to the jury was constitutionally adequate.  It

27

28

09cv463

1  further found that the Constitution did not require more than the judge directing the jury's attention to

2  the constitutionally adequate instruction that answered the jury's question.  Id. at 234.

3         In reaching its decision, the <u>Weeks</u> Court also relied on the following presumptions: 1) a jury is

4  presumed to follow its instructions; and 2) a jury is presumed to understand a judge's answer to its

5  question.  Id.   However, the Court implied that such presumptions were rebuttable because the Court

6  also stated that several  empirical factors supported the presumption.  Included in those factors was the

7  jury's deliberation for more than two hours after receiving the judge's answer to its question, the fact

8  that the jury did not ask any further questions, the failure of petitioner's attorney to mention this issue

9  during his oral motion to set aside the death sentence, and the fact that petitioner assigned this claim low

10  priority in his habeas petition.  Id. at 234-35.

11         This case is easily distinguishable from <u>Weeks</u>.  The jury in <u>Weeks</u> never expressed confusion

12  about a specific instruction.  Rather, the jury sought clarification on whether they were required to

13  impose a particular sentence based on specific findings they had already made.  As the answer to that

14  question already lied in one of their instructions, the Court directed them to re-read that specific

15  instruction.

16         In this case, however, since the instruction itself caused confusion, the trial court had to do more

17  than simply tell the jury to reread it.  As the Supreme Court stated in <u>Griffin v. United States</u>:

18       [j]urors are not generally equipped to determine whether a particular theory of conviction
         submitted to them is contrary to law- whether, for example, the action in question is protected by
19       the Constitution, is time barred, or fails to come within the statutory definition of the crime.
         When, therefore, jurors have been left the option of relying upon a legally inadequate theory,
20       there is no reason to think that their own intelligence and expertise will save them from that
         error.  502 U.S. 46, 59 (1991).
21

22         Moreover, here the empirical factors effectively rebut the presumption that a jury is presumed to

23  understand the judge's response to its questions.  Both of the jury's questions concerned the same

24  language of a specific jury instruction, the jury reached a verdict less than an hour after being directed to

25  reread the burglary instruction, during post-verdict conversations with the prosecutor multiple jurors

26  admitted they did not follow the instruction's mandate to find the element of entry with the specific

27  intent to commit theft, petitioner argued this issue during sentencing, and petitioner has assigned this

28  claim the highest priority on appeal.   In addition, petitioner has already had one conviction reversed

09cv463

1  based on the fact that the jury was able to erroneously convict him based on his possession of a

2  prohibited item before entering a dwelling.

3      Yet, based on the foregoing, the California Court of Appeals found that:

4        [t]he jury notes merely indicate that at two different points of time, at least one juror was
      unclear as to the target offense.  Beyond this, Armitage's suggestion that the jury

5        convicted him of burglary on the basis that he had the specific intent to be under the
      influence of methamphetamine is unsupported. ( Log. 9 at 11-12.)

6

7      In light of the facts presented, this Court finds it objectively unreasonable for the California

8  Court of Appeals to have determined there was "nothing erroneous" about the trial court's responses to

9  the jury's question based on its finding that "the notes merely indicate at two different points of time, at

10  least one juror was unclear as to the target offense."  The notes conclusively demonstrate the

11  questioning juror (s) were very clear about the target offense argued by the district attorney.  However,

12  the  wording of the jury's questions and the prosecutor's statement during sentencing indicate at least

13  one, and most likely more than one, juror convicted petitioner based on another target offense, one that

14  was never argued during trial and is not legally sufficient to sustain a burglary conviction.

15      Under these circumstances,  the trial court's decision to respond to the jury's question by just

16  directing it to reread the instruction was error.  The next question is whether that error "had substantial

17  and injurious effect or influence in determining the jury's verdict"  Brecht v. Abrahamson, 507 U.S.

18  619, 637 (1993).  The Supreme Court adopted the Brecht "substantial and injurious effect" standard

19  from an earlier case, Kotteakos v. United States, 328 U.S. 750 (1946).  In Kotteakos, the Court stated:

20        If, when all is said and done, the conviction is sure that the error did not influence the jury, or
      had but very slight effect, the verdict and the judgment should stand, except perhaps where the

21        departure is from a constitutional norm or a specific command of Congress . . . But if one cannot
      say, with fair assurance, after pondering all that happened without stripping the erroneous action

22        from the whole, that the judgment was not substantially swayed by the error, it is impossible to
      conclude that substantial rights were not affected.  The inquiry cannot be merely whether there

23        was enough to support the result, apart from the phase affected by the error.  It is rather, even so,
      whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the

24        conviction cannot stand.  Id. at 764-65

25

26      Under Kotteakos, it does not matter if there was sufficient evidence to support the September

27  burglary conviction under an intent to commit theft theory, as the California Court of Appeals stated, or

28  that the jury "would have found" petitioner guilty under an intent to commit theft theory, as the

09cv463

prosecutor stated during sentencing.  The only question is whether the jury's verdict on the September

burglary was procured because one or more jurors erroneously thought petitioner's possession/ingestion

of methamphetamine could satisfy the "any felony" requirement.   Based on the jury notes

demonstrating that at least one juror rejected the prosecutor's intent to commit theft theory of the case

and the trial court's failure to eliminate confusion about whether the possession of methamphetamine

could satisfy the "any felony" element, this Court has no doubt that the trial court's erroneous response

had a substantial and injurious effect on the jury verdict.  Accordingly, this Court recommends that

petitioner's habeas petition be GRANTED with respect to this claim.

## V.    CONCLUSION

Based on the foregoing analysis, the Court RECOMMENDS the instant petition be GRANTED

with respect to Claim 1 and DENIED with respect to Claim 2.  This Report and Recommendation of the

undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, the

Honorable M. James Lorenz, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(2007) and Local Rule

72.1(d).

IT IS HEREBY ORDERED that no later than August 13, 2010, any party may file and serve

written objections with the Court and serve a copy on all parties.  The document should be captioned

"Objections to Report and Recommendation."

//
//
//
//
//
//
//
//
//

09cv463

1    IT IS FURTHER ORDERED that any reply to the objection shall be filed and served no later

2 than seven days after being served with the objections.  The parties are advised that failure to file

3 objections within the specified time may waive the right to raise those objections on appeal of the

4 Court's order.  Martinez v. Yist, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

5    IT IS SO ORDERED.

6 DATED:  July 14, 2010

7
                                                    _____
8                                                    LOUISA S PORTER
                                                    United States Magistrate Judge
9

10 cc:          The Honorable M. James Lorenz
              all parties
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09cv463